UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ROBERT J. ELDER ,

                        Plaintiff,

        v.

CAROLYN W. COLVIN,[1] Commissioner of
 Social Security,

                    Defendant.

                                              **REPORT**
                                              **and**
                                      **RECOMMENDATION**

                                            **12-CV-00338A(F)**

APPEARANCES:           LAW OFFICES OF KENNETH HILLER
                            Attorneys for Plaintiff
                            JAYA ANN SHURTLIFF, of Counsel
                            6000 North Bailey Avenue
                            Suite 1A
                            Amherst, New York 14226

                            WILLIAM J. HOCHUL, JR.
                            UNITED STATES ATTORNEY
                            Attorney for Defendant
                            MARY K. ROACH
                            Assistant United States Attorney, of Counsel
                            Federal Centre
                            138 Delaware Avenue
                            Buffalo, New York 14202, and

                            STEPHEN P. CONTE
                            Regional Chief Counsel - Region II
                            JASON P. PECK
                            Assistant Regional Counsel
                            United States Social Security Administration
                            Office of the General Counsel, of Counsel
                            26 Federal Plaza
                            Room 3904
                            New York, New York 10278

---

[1] Carolyn W. Colvin became Acting Commissioner of the Social Security Administration on February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as the defendant in this suit.  No further action is required to continue this suit by reason of sentence one of 42 U.S.C. § 405(g).

## JURISDICTION

This action was referred to the undersigned by Honorable Richard J. Arcara on July 27, 2012. (Doc. No. 6).  The matter is presently before the court on motions for judgment on the pleadings, filed on January 31, 2013, by Defendant (Doc. No. 12), and on February 7, 2013, by Plaintiff (Doc. No. 15).

## BACKGROUND

Plaintiff John Elder ("Plaintiff" or "Elder"), seeks review of Defendant's decision denying him Disability Insurance Benefits ("DIB") ("disability benefits") under, Title II of the Social Security Act ("the Act"), and Supplemental Security Income Benefits ("SSI") benefits under Title XVI of the Act.  In denying Plaintiff's application for disability benefits, Defendant determined Plaintiff had the severe impairments of alcohol related seizure disorder, Raynaud's disease, alcohol abuse and depression, but does not have an impairment or combination of impairments within the Act's definition of impairment.  (R. 14). [2] Defendant further determined that even if Plaintiff's medically determinable impairments could reasonably be expected to produce Plaintiff's alleged symptoms, their alleged persistence and limiting effects were not credible (R. 17), and that the ALJ's determination that Plaintiff is not disabled factoring in Plaintiff's alcohol abuse, made it unnecessary to further determine whether alcohol abuse was a contributing factor material to the ALJ's disability determination.  (R. 20).  As such, Plaintiff was found not disabled, as defined in the Act, at any time from the alleged onset date through the date of the Administrative Law Judge's decision on August 26, 2010.  *Id.*

---

[2] "R" references are to the page numbers of the Administrative Record submitted in this case for the Court's review.

## PROCEDURAL HISTORY

Plaintiff filed applications for disability benefits on October 19, 2009 (R. 119-20), and supplemental security income benefits on October 29, 2009 (R. 121-24), alleging disability based on a seizure disorder, Raynaud's syndrome, depression, and lower back and leg neuropathy as of October 21, 2004[3]. (R. 176). Plaintiff's applications were initially denied by Defendant on February 1, 2010 (R. 62), and, pursuant to Plaintiff's request filed March 15, 2010 (R. 72-73), a hearing was held before Administrative Law Judge Robert T. Harvey ("Harvey" or "the ALJ") on August 6, 2010, in Buffalo, New York. (R. 27-61). Plaintiff, represented by Clifford Falk, Esq., ("Falk"), appeared and testified at the hearing. (R. 27-52). Testimony was also given by vocational expert Timothy Janakowski ("Janakowski" or "the VE"). (R. 52-61). The ALJ's decision denying the claim was rendered on August 26, 2010. (R. 9-24).

On September 3, 2010, Plaintiff requested review of the ALJ's decision by the Appeals Council. (R. 117-18). The ALJ's decision became Defendant's final decision when the Appeals Council denied Plaintiff's request for review on February 22, 2012. (R. 3-5). This action followed on April 18, 2012; with Plaintiff alleging the ALJ erred by failing to find him disabled. (Doc. No. 1).

Defendant filed an answer on July 26, 2012 (Doc. No. 5), and on January 31, 2013, filed a motion for judgment on the pleadings ("Defendant's motion"), accompanied by a memorandum of law (Doc. No. 13) ("Defendant's Memorandum"). Plaintiff filed a motion for judgment on the pleadings ("Plaintiff's motion") on February 7, 2013,

---

[3] At the Administrative hearing on August 6, 2010, Plaintiff amended the alleged onset date of disability from October 21, 2004 to April 23, 2008. (R. 28).

accompanied by a supporting memorandum of law (Doc. No. 15) ("Plaintiff's

Memorandum").  Oral argument was deemed unnecessary.

Based on the following, Defendant's motion should be DENIED, Plaintiff's motion

should be DENIED in part and GRANTED in part, and the matter remanded for further

development of the record.

## **FACTS**[4]

Plaintiff Robert Elder ("Plaintiff") was born on April 9, 1979.  On May 30, 2008,

Thomas J. Kufel, M.D. ("Dr. Kufel"), a physician with the VA Medical Center of Buffalo,

completed a consultative medical examination on Plaintiff for insomnia, opined that

Plaintiff's insomnia and seizure disorder was related to a traumatic brain injury that

occurred when plaintiff was 18 years old, noted Plaintiff's blood serum Dilantin level

measured at less than .5 mcg/mL,[5] and referred Plaintiff to an insomnia clinic and for

psychiatric evaluation.  (R. 264).  Dr. Kufel noted that Plaintiff's medical history included

toxic encephalopathy, seizure disorder, seropositive ana (anti-nuclear antibody testing)

with inflammatory arthritis, and lumbar disc disease.  (R. 263).

On September 16, 2008, David L. Hallasey, M.D. ("Dr. Hallasey"), completed an

annual physical examination of Plaintiff and assessed Plaintiff with tonic-clonic[6] seizure

history, knee and hand rheumatoid arthritis, depression, alcohol abuse, Raynaud's

disease, and possible lower left rib fracture.  (R. 284).  Dr. Hallasey referred Plaintiff for

brain magnetic resonance imaging ("MRI") and magnetic resonance angiogram

("MRA"), a lower left rib X-ray, and prescribed Citalopram (depression), and

---

[4] Taken from the pleadings and the administrative record.
[5] Dilantin levels for therapeutic treatment of seizures typically measure between 10 and 20 mcg/mL, *i.e.*, indicating the patient's levels after taking prescribed medications such as Dilantin to control the patient's epileptic seizures are medically effective.
[6] Tonic-clonic seizures, formerly grand mal seizures, are a type of generalized seizure that affect the entire brain.

Cryoglobulins (Raynaud's), Levetiracetam (seizures), and encouraged Plaintiff to enter alcohol treatment.  *Id.*

On March 28, 2009, Gerald J. Tiballi, M.D. ("Dr. Tiballi"), a physician at Mount St. Mary's Hospital in Niagara Falls, New York, completed a computerized tomography ("CT") scan without contrast[7] of Plaintiff's brain that showed normal results.  (R. 210).

On April 20, 2009, Linda A. Hershey, M.D. ("Dr. Hershey"), completed a neurological consultation on Plaintiff, changed Plaintiff's migraine medication from valporic acid to divalproex, and ordered a brain CT scan with contrast and electroencephalography ("EEG") scan on Plaintiff.  (R. 252).

On September 23, 2009, Linda S. Fuchs, D.O. ("Dr. Fuchs"), an osteopathic physician, completed a brain MRI on Plaintiff that showed a 3mm polyp on Plaintiff's maxillary sinus.  (R. 228).  A brain MRA completed and interpreted the same day by Fereidoun Eshfahani, M.D. ("Dr. Eshfahani"), a radiologist in Dr. Tiballi's office, was also normal.  (R. 229).

On November 17, 2009, Sherry Withiam-Leitch, M.D. ("Dr. Withiam-Leitch"), a neurologist, completed a peripheral nerve examination on Plaintiff that showed decreased sensation of Plaintiff's L5-S1[8] distribution, and absence of Plaintiff's bilateral ankle reflexes.  (R. 350).

On December 21, 2009, Renee Baskin, PhD. ("Dr. Baskin") completed a consultative psychiatric evaluation of Plaintiff and assessed Plaintiff with intact concentration and memory, low to below average intellectual functioning, fair to good

---

[7] Contrast refers to a substance taken orally or injection that causes tissue to be seen more clearly in a CT scan.
[8] "L5" refers to the fifth vertebral segment of the lumbar area of the spine. "S1" refers to the fist sacral vertebra of the spine.

insight and judgment, and capable of activities of daily living with limitation to sitting, standing, lifting, and bending, and no history of drug or alcohol abuse.  (R. 294-95).  Dr. Baskin diagnosed Plaintiff with anxiety disorder not otherwise specified ("NOS"), depressive disorder NOS, seizure disorder and back and leg pain, and recommended Plaintiff continue psychological/psychiatric counseling and enter vocational training.  (R. 296).  Dr. Baskin opined Plaintiff had no limitation to following simple directions or instructions, performing simple and complex tasks independently, maintaining attention and concentration, maintaining a regular schedule, learning new tasks with supervision, making appropriate decisions, relating adequately with others, and that Plaintiff would have moderate limitation to stress.  (R. 295-96).  The same day, Kathleen Kelley, M.D. ("Dr. Kelley"), completed a consultative neurological examination of Plaintiff and assessed Plaintiff with intact hand and finger dexterity, normal cervical, head, neck, and lower and upper extremity range of motion ("ROM"), normal gait and station, and normal sensory examination.  (R. 298-99).  Plaintiff reported his activities of daily living include cooking once per week, no cleaning, laundry or shopping, taking care of personal hygiene, socializing with friends, and writing poetry.  (R. 298).  Dr. Kelley diagnosed Plaintiff with seizures, migraines, non-specific low back pain discomfort and neuropathy, and alcohol use.  (R. 300).

On February 1, 2010, T. Andrews ("Andrews"), a psychologist with the Social Security Administration, completed a psychiatric review technique on Plaintiff and assessed Plaintiff with depressive disorder NOS (R. 304), anxiety disorder NOS (R. 306), no substance addiction disorder (R. 309), and opined Plaintiff's activities of daily living were compromised by Plaintiff's physical, not psychological, problems, and that

Plaintiff's psychiatric impairment did not impact Plaintiff's ability to function.  (R. 313).

The same day, single decision maker ("SDM")[9] J. Cumbo ("SDM Cumbo"), completed a

residual functional capacity assessment on behalf of the Social Security Administration,

and assessed Plaintiff with the ability to occasionally lift 20 pounds, frequently lift 10

pounds, stand or sit 6 hours in an eight hour day, and unlimited ability to push and pull.

(R. 316-17).

On April 17, 2010, Plaintiff after threatening to stab himself (R. 378), was

admitted to Veteran's Administration Hospital ("the VA") where Aimee Stanislawski,

M.D. ("Dr. Stanislawski") assessed Plaintiff with a Global Assessment of Functioning

("GAF") score of 45,[10] noted Plaintiff was drinking 2 to 6 servings of beer each day, and

diagnosed Plaintiff with mood disorder NOS, alcohol abuse and epilepsy.  (R. 347).

Upon discharge, Plaintiff's medications included Celexa (depression), levetiracetam

(Keppra)[11] (seizures), Lidocain (pain), lozepram (anxiety), Meloxicam (arthritis), and

Nifedipine (Raynaud's syndrome).  (R. 348).  Plaintiff remained hospitalized until April

23, 2010, and upon Plaintiff's request for discharge, licensed clinical social worker

("CSW") Linda A. Macaluso ("CSW Macaluso"), assessed Plaintiff with continued high

suicide risk, and noted that Plaintiff was not satisfied with his depression and epileptic

---

[9] The term "single decision maker" or "SDM" refers to a "non-physician, state-agency disability analyst" who "'may make the initial disability determination in most cases without requiring the signature of a medical consultant.'" *Roth v. Commissioner of Social Security*, 2012 WL 4480688, at *6 (N.D.N.Y. Sep't. 26, 2012)(quoting 71 Fed. Reg. 45890-01 (Aug. 10, 2006)).

[10] The Global Assessment of Functioning (GAF) scale is used to report an individual's overall level of functioning. http:// *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th Edition, Text Revision) ("DSM-IV-TR"). A GAF of 41-50 indicates: Serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or social functioning (*e.g.*, no friends, unable to keep a job) . . . A GAF of 51-60 [indicates] moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning (*e.g.*, few friends, conflicts with peers or co-workers). DSM-IV-TR at 32.

[11] Keppra levels for therapeutic treatment of seizures typically measure between 5-45 ug/mL, *i.e.*, indicating the patient's levels after taking prescribed medications such as Keppra to control the patient's epileptic seizures are medically effective.

medications and tearful and anxious about getting a job.  (R. 370). During a psychiatric

evaluation the same day with Anselm George, M.D. ("Dr. George"), a psychiatrist with

the VA, Plaintiff reported he was not satisfied with his neurology treatment at the VA.

(R. 368).  Dr. George further noted a discrepancy between the VA resident physician's

indication that Plaintiff reported he was not satisfied with his Keppra medication, and a

note from Dr. Hershey indicating that Plaintiff wished to continue taking Keppra.  (R.

368).  Dr. George further noted that Plaintiff was not satisfied with the Citalopram

medication taken for headaches, and increased Plaintiff's Citalopram dosage from 40

mg to 60 mg.  (R. 369).

On May 6, 2010, Julia Gane-Cosimano, a lead care coordinator with the VA,

contacted Plaintiff for telephone psychotherapy, and noted Plaintiff reported he had

stopped using alcohol for one week, with increased depression, isolation and irritability.

(R. 361).

On May 10, 2010, VA CSW Kimberly J. Ingram ("CSW Ingram"), completed a

psychological telephone interview with Plaintiff, and opined Plaintiff's insight and

judgment were limited by Plaintiff's depression, and that Plaintiff sounded depressed

with quiet speech.  (R. 360).  On May 12, 2010, CSW Macaluso provided vocational

counseling to Plaintiff, noting Plaintiff exhibited no suicidal or homicidal intentions, no

hallucinations, and congruent mood, but expressed anxiety about home foreclosure and

becoming homeless.  (R. 358).  CSW Macaluso referred Plaintiff to the VA's psychiatric

walk-in clinic for counseling.

On May 17, 2010, Dr. George noted Plaintiff reported feeling very poorly, was

feeling lost, stayed in the house most days, and frequently experienced disturbing

thoughts. (R. 354). After changing Plaintiff's depression medication, Dr. George noted

that Plaintiff was scheduled for vocational rehabilitation and opined Plaintiff was not

capable of keeping a job. (R. 355).

## DISCUSSION

### 1. Disability Determination Under the Social Security Act

An individual is entitled to disability insurance benefits under the Social Security

Act if the individual is unable

> to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which
> can be expected to result in death or which has lasted or can
> be expected to last for a continuous period of not less than
> 12 months. . .. An individual shall be determined to be under
> a disability only if his physical or mental impairment or
> impairments are of such severity that he is not only unable to
> do his previous work but cannot, considering his age,
> education, and work experience, engage in any other kind of
> substantial gainful work which exists in the national
> economy.

42 U.S.C. §§ 423(d)(1)(A) & (2)(A), and 1382c(a)(3)(A) & (C)(I).

Once a claimant proves he or she is severely impaired and unable to perform

any past relevant work, the burden shifts to the Commissioner to prove there is

alternative employment in the national economy suitable to the claimant. *Parker v.*

*Harris,* 626 F.2d 225, 231 (2d Cir. 1980).

### A. Standard and Scope of Judicial Review

The standard of review for courts reviewing administrative findings regarding

disability benefits, 42 U.S.C. §§ 401-34 and 1381-85, is whether the administrative law

judge's findings are supported by substantial evidence. *Richardson v. Perales*, 402

U.S. 389, 401 (1971). Substantial evidence requires enough evidence that a

reasonable person would "accept as adequate to support a conclusion." *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938).

When evaluating a claim, the Commissioner must consider "objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability (testified to by the claimant and others), and . . . educational background, age and work experience." *Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d Cir. 1983) (quoting *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)).  If the opinion of the treating physician is supported by medically acceptable techniques and results from frequent examinations, and the opinion supports the administrative record, the treating physician's opinion will be given controlling weight.  *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993); 20 C.F.R. § 404.1527(d); 20 C.F.R. § 416.927(d).
The Commissioner's final determination will be affirmed, absent legal error, if it is supported by substantial evidence.  *Dumas,* 712 F.2d at 1550; 42 U.S.C. §§  405(g) and 1383(c)(3).  "Congress has instructed . . . that the factual findings of the Secretary,[12] if supported by substantial evidence, shall be conclusive."  *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

The applicable regulations set forth a five-step analysis the Commissioner must follow in determining eligibility for disability insurance benefits.  20 C.F.R. §§ 404.1520 and 416.920.  *See Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986); *Berry v. Schweiker*, 675 F.2d 464 (2d Cir. 1982).  The first step is to determine whether the applicant is engaged in substantial gainful activity during the period for which benefits are claimed.  20 C.F.R. §§ 404.1520(b) and 416.920(b).  If the claimant is engaged in

---

[12] Pursuant to the Social Security Independence and Program Improvements Act of 1994, the function of the Secretary of Health and Human Services in Social Security cases was transferred to the Commissioner of Social Security, effective March 31, 1995.

such activity the inquiry ceases and the claimant is not eligible for disability benefits. *Id.* The next step is to determine whether the applicant has a severe impairment which significantly limits the physical or mental ability to do basic work activities as defined in the applicable regulations. 20 C.F.R. §§ 404.1520(c) and 416.920(c). Absent such a severe impairment, the applicant is not eligible for disability benefits. *Id.* Third, if there is a severe impairment and the severe impairment, or an equivalent, is listed in Appendix 1 of the regulations and meets the duration requirement, the individual is deemed disabled, regardless of the applicant's age, education or work experience, 20 C.F.R. §§ 404.1520(d) and 416.920(d), as, in such a case, there is a presumption the applicant with such an impairment is unable to perform substantial gainful activity.[13] 42 U.S.C. §§ 423(d)(1)(A) and 1382(c)(a)(3)(A); 20 C.F.R. §§ 404.1520 and 416.920. *See also Cosme v. Bowen*, 1986 WL 12118, at * 2 (S.D.N.Y. Oct. 21, 1986); *Clemente v. Bowen*, 646 F.Supp. 1265, 1270 (S.D.N.Y. 1986).

However, as a fourth step, if the impairment or its equivalent is not listed in Appendix 1, the Commissioner must then consider the applicant's "residual functional capacity" and the demands of any past work. 20 C.F.R. §§ 404.1520(e), 416.920(e). If the applicant can still perform work he or she has done in the past, the applicant will be denied disability benefits. *Id.* Finally, if the applicant is unable to perform any past work, the Commissioner will consider the individual's "residual functional capacity," age, education and past work experience in order to determine whether the applicant can perform any alternative employment. 20 C.F.R. §§ 404.1520(f), 416.920(f). *See also Berry,* 675 F.2d at 467 (where impairment(s) are not among those listed, claimant must

---

[13] The applicant must meet the duration requirement which mandates that the impairment must last or be expected to last for at least a twelve-month period. 20 C.F.R. §§ 404.1509 and 416.909.

show that he is without "the residual functional capacity to perform [her] past work").  If the Commissioner finds that the applicant cannot perform any other work, the applicant is considered disabled and eligible for disability benefits.  20 C.F.R. §§ 404.1520(g), 416.920(g).  The applicant bears the burden of proof as to the first four steps, while the Commissioner bears the burden of proof on the final step relating to other employment. *Berry,* 675 F.2d at 467.

In instances where medical evidence of alcohol or drug abuse exists, the inquiry does not end with the five-step analysis, rather, it is necessary to evaluate whether the claimant's current physical and mental limitations would remain if the claimant stopped using drugs or alcohol.  20 C.F.R. § 416.935(b)(2)  ("§416.935(b)(2)").  If the ALJ determines a claimant's remaining limitations would not be disabling, a finding that the drug or alcohol addiction is a contributing factor material to the determination of disability is required.  20 C.F.R. § 404.935(b)(2)(i) ("§ 416.935(b)(2)(i).  Alternatively, if the ALJ determines the claimant's remaining limitations are disabling, a finding that the drug or alcohol addiction is not a contributing factor material to the determination of disability is proper, and the claimant is deemed disabled independent of the claimant's drug or alcohol addiction  20 C.F.R. § 416.935(b)(2)(ii) ("§ 416.935(b)(2)(ii)").  In reviewing the administrative finding, the court must follow the five-step analysis and 20 C.F.R. § 416.935(a) ("§ 416.935(a)"), to determine if there was substantial evidence on which the Commissioner based the decision.  20 C.F.R. § 416.935(a); *Richardson*, 402 U.S. at 410.

**B.**    <u>Substantial Gainful Activity</u>

The first inquiry is whether the applicant engaged in substantial gainful activity. "Substantial gainful activity" is defined as "work that involves doing significant and productive physical or mental duties" done for pay or profit.  20 C.F.R. § 404.1510(a)(b). Substantial work activity includes work activity that is done on a part-time basis even if it includes less responsibility or pay than work previously performed.  20 C.F.R. § 404.1572(a).  Earnings may also determine engagement in substantial gainful activity. 20 C.F.R. § 404.1574.  In this case, the ALJ concluded Plaintiff, though working as a security guard in 2009, did not engage in substantial gainful activity since April 23, 2008, the onset date of the alleged disability.  (R. 14).  Plaintiff does not contest this determination.

**C.**    <u>Severe Physical or Mental Impairment</u>

The second step of the analysis requires a determination whether the disability claimant had a severe medically determinable physical or mental impairment that meets the duration requirement in 20 C.F.R. § 404.1509 ("§ 404.1509"), and significantly limits the claimant's ability to do "basic work activities."  If no severe impairment is found, the claimant is deemed not disabled and the inquiry ends.  20 C.F.R. § 404.1420(a)(4)(ii). In this case, the ALJ determined Plaintiff had the severe impairments of alcohol related seizure disorder, Raynaud's disease, alcohol abuse and depression as defined under 20 C.F.R. § 404.1520(c) ("§ 404.1520(c)").  (R. 14).  Plaintiff does not contest the ALJ's finding that Plaintiff's alcohol related seizure disorder, Raynaud's disease, alcohol abuse and depression are severe, but contests the ALJ's failure to include Plaintiff's

peripheral neuropathy within the ALJ's step two analysis.  Plaintiff's Memorandum at 8-10.

The Act defines "basic work activities" as "abilities and aptitudes necessary to do most jobs," and includes physical functions like walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b) ("§ 404.1521(b)"), 416.921(b).  The step two analysis may do nothing more than screen out *de minimus* claims,  *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995), and a finding of a non-severe impairment should be made only where the medical evidence establishes only a slight abnormality which would have no more than a minimal effect on the claimant's ability to work.  *Rosario v. Apfel,* 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting Social Security Ruling ("S.S.R.") 85-28, 1985 WL 56856).

In this case, Plaintiff correctly contends Plaintiff's peripheral neuropathy rises to the level of severity required under step two of the disability analysis.  In particular, Plaintiff's peripheral neuropathy is supported by clinical findings including Dr. Withiam-Leitch's peripheral nerve examination of Plaintiff on November 17, 2009, that revealed decreased sensation of Plaintiff's L5-S1 distribution, and absence of Plaintiff's bilateral ankle reflexes (R. 350), and Dr. Kelley's determination on December 21, 2009, that Plaintiff's peripheral neuropathy would require Plaintiff to take comfort breaks between extended periods of lumbar twisting, standing, sitting, and using foot pedals while at work.  (R. 300).  As such, substantial evidence in the record thus supports Plaintiff's

peripheral neuropathy affects Plaintiff's ability to do basic work and Plaintiff's peripheral neuropathy is a "severe" impairment under 20 C.F.R. § 404.1520(a)(4)(ii).

Plaintiff's motion on this issue should be GRANTED as to his alternative request that the matter be remanded for a new hearing.  Upon remand, the ALJ should include Plaintiff's peripheral neuropathy as a severe impairment as defined under 20 C.F.R. § 404.1512(b)(1), and as an impairment in each subsequent step of the ALJ's disability analysis, including whether Plaintiff's peripheral neuropathy, alone, or in combination with another impairment, meets or equals the criteria for a listed impairment under Appendix 1 of 20 C.F.R. Pt. 404, Subpt. P ("The Listing of Impairments").  Although the undersigned is recommending remanding the matter for a new hearing, the remaining steps of the disability analysis are considered in the alternative should the district judge disagree with the initial recommendation.

### D.   Listing of Impairments, Appendix 1

The third step is to determine whether a claimant's impairment or impairments are listed in the regulations at Appendix 1 of 20 C.F.R. Pt. 404, Subpt. P.  If the impairments are listed in the Appendix, and the duration requirement is satisfied, the impairment or impairments are considered severe enough to prevent the claimant from performing any gainful activity and the claimant is considered disabled.  20 C.F.R. §§ 404.1525(a), 416.925(a); *Melville v. Apfel*, 198 F.3d. 45, 51 (2d Cir. 1999) ("if the claimant's impairment is equivalent to one of the listed impairments, the claimant is considered disabled").  The relevant listing of impairments in this case includes 20 C.F.R. Pt. 404, Subt. P, Appendix 1, § 11.02 ("11.02") (Epilepsy - convulsive), [14]  20

---

[14] The record reflects Plaintiff experiences only convulsive seizures and accordingly, § 11.03, pertaining to nonconvulsive epilepsy, will not be included for purposes of this discussion.

C.F.R. Pt. 404, Subpt. P, Appendix 1 § 11.14 ("§ 11.14") (Peripheral Neuropathies), 20

C.F.R. Pt. 404, Subpt. P, Appendix 1 § 12.04 ("§ 12.04") (Affective Disorders), and 20

C.F.R. Pt. 404, Subpt. P, Appendix 1, § 12.09 ("§ 12.09") (Substance Addiction

Disorders). In the instant case, the ALJ determined Plaintiff's impairments do not meet

or equal the criteria necessary to establish disability under § § 11.02, 11.03, 11.14,

12.04 or 12.09.

**Epilepsy-convulsive**

In this case, the ALJ determined that Plaintiff's epileptic seizures occur as a

result of Plaintiff's alcohol use (R. 14), and that Plaintiff's non-compliance with Plaintiff's

treatment regimen including prescribed medications for seizures exacerbated Plaintiff's

epilepsy.  (R. 14, 18).

To be considered disabled under § 11.02, a disability claimant must provide

evidence documented by a detailed description of a typical seizure pattern, including all

associated phenomena, occurring more frequently than once a month in spite of at least

3 months of prescribed treatment with:

    A.  Daytime episodes (loss of consciousness and convulsive seizures) or
    B.  Nocturnal episodes manifesting residuals which interfere significantly with
       activity during the day.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.02.

Regardless of etiology, the degree of impairment of a claimant's convulsive epilepsy is

analyzed according to type, frequency, duration and sequelae of seizures.  20 C.F.R.

Pt. 404, Subpt. P, App. 1, § 11.00A ("§ 11.00A").  At least one description of the

claimant's typical seizure is required and should include the presence or absence of

aura, tongue bites, sphincter control, injury, and postictal (altered state of

consciousness after an epileptic seizure) phenomena, and testimony of persons other than the claimant where medical observations are otherwise not available. *Id.*

In this case, Plaintiff was diagnosed with convulsive seizures by Dr. Samie on May 14, 2008 (R. 261), Dr. Hallasey on September 16, 2008 (R. 284), Dr. Baskin on December 21, 2009 (R. 294), and Dr. Stanislawski on April 17, 2010 (R. 347).  Plaintiff's antiepileptic medications to control seizures include Dilantin, Depakote, and Keppra. (R. 264, 274, 348, 399).  Plaintiff testified he experiences seizures five days each month with two to three seizure episodes each day (R. 35), and during the administrative hearing on August 6, 2010, Plaintiff's wife provided a detailed description of Plaintiff's convulsive episodes

> [Plaintiff] first gets an aura . . . [and] knows when he's going to have one probably within a minute or two of actually having it. I find somewhere to lay him down because he does start to convulse violently . . . then he starts to actually almost like vomit but drool and spit come from his nose and mouth. He starts to choke on it so I have to clear his pathways . . . [a]nd then I make sure [Plaintiff is] on his side . . . it usually lasts somewhere between a minute and three minutes and any, anytime after that I have to call the ambulance if I can't get him, you know, to come to at some point.

(R. 51).

The foregoing evidence, undisputed by Defendant, is thus sufficient to meet the threshold criteria for disability under § 11.02.  However, after meeting the threshold criteria under § 11.02, consideration of disability under § 11.02 must also include evaluation of the claimant's compliance with treatment using serum blood tests, *i.e.*, whether the claimant's epileptic seizures persist despite the fact the claimant is following a prescribed antiepileptic treatment regimen.

In instances where a disability claimant's blood serum levels suggest therapeutic non-compliance, *i.e.*, a claimant's voluntary failure or refusal to comply with taking

medications as prescribed, 20 C.F.R. Pt. 404, Supt. P, App. 1 § 11.00A ("§ 11.00A")

requires ALJ's to consider specific evidence in conjunction with the claimant's blood

serum results to accurately assess such non-compliance:

> Adherence to prescribed antiepileptic therapy can ordinarily be determined from objective clinical findings in the report of the physician currently providing treatment for epilepsy. Determination of blood levels of phenytoin sodium or other antiepileptic drugs may serve to indicate whether the prescribed medication is being taken. When seizures are occurring at the frequency stated in 11.02 or 11.03, evaluation of the severity of the impairment must include consideration of the serum drug levels. Should serum drug levels appear therapeutically inadequate, consideration should be given as to whether this is caused by individual idiosyncrasy in absorption of metabolism of the drug. Blood drug levels should be evaluated in conjunction with all the other evidence to determine the extent of compliance. When the reported blood drug levels are low, therefore, the information obtained from the treating source should include the physician's statement as to why the levels are low and the results of the relevant diagnostic studies concerning the blood levels.  Where adequate seizure control is obtained only with unusually large doses, the possibility of impairment resulting from the side effects of the medication must also be assessed. Where documentation shows that the use of alcohol or drugs affects adherence to the prescribed therapy or may play a part in the precipitation of seizures, this must also be considered in the overall assessment of impairment level.

20 C.F.R. Pt. 404, Supt. P, App. 1 § 11.00A ("§ 11.00A").

In this case, the ALJ determined that Plaintiff was not disabled under § 11.02,

because Plaintiff failed to take Dilantin as had been prescribed to Plaintiff for more than

a year before April 28, 2008, the alleged onset date of disability, and that Plaintiff's low

Dilantin level on May 30, 2008 (R. 264), supported a conclusion that Plaintiff was non-

compliant with Plaintiff's antiepileptic treatment regimen.  (R. 18).  Significantly, Plaintiff

does not contest the ALJ's determination that Plaintiff is not disabled under § 11.02 as a

result of Plaintiff's medical treatment non-compliance.  Notwithstanding Plaintiff's failure

to contest this determination, in the interest of completeness, however, the undersigned

proceeds to review whether substantial evidence supports the ALJ's determination.

*See* 42 U.S.C. § 405(g).

In this case, the ALJ's determination (R. 19) that Plaintiff was not disabled under § 11.02 because Plaintiff did not follow Plaintiff's prescribed antiepileptic therapy is contrary to substantial evidence in the record, as Plaintiff continued to suffer seizures during the 26-month period between May 30, 2008 (the last date Plaintiff's Dilantin level was measured), and the date of the administrative hearing on August 6, 2010, while continuing to follow Plaintiff's prescribed anti-epileptic treatment plan.  (R. 284, 274, 202, 293, 200).  In particular, on March 26, 2009, Plaintiff was admitted to Mount St. Mary's Hospital emergency room after suffering five seizures (R. 209-19, 268), where upon Plaintiff's admission, Dr. Tiballi changed Plaintiff's anti-seizure medication from Dilantin to Keppra.  (R. 214). A blood test administered the same day did not include evaluation of Plaintiff's Dilantin or Keppra levels.  *Id.*  A subsequent serum blood test on August 17, 2009, also failed to include evaluation of Plaintiff's Keppra level to assess Plaintiff's compliance with treatment.  (R. 230-37).  On December 21, 2009, Dr. Kelly noted that Plaintiff reported two to three seizures a month while taking Keppra  (R. 297), and Plaintiff's medication log reveals on January 6, 2010, Plaintiff's Keppra dose was increased from 500 mg to 750 mg in response to seizure activity.  (R. 202).  As such, in this case, the record does not include evidence to establish whether Plaintiff complied with Plaintiff's prescribed treatment regimen during the period between May 30, 2008 and August 6, 2010, or detailed information from Plaintiff's treating physician that serves to establish whether Plaintiff's continuing seizures are a result of factors beyond Plaintiff's control which if present, may indicate Plaintiff's condition qualifies for benefits.

Social Security Ruling ("S.S.R.") 87-6[15] (1987), directs that in instances where a treating source indicates frequent seizures are occurring (or continue to occur) despite anticonvulsant therapy, and the required information is not in the initial report, it may be necessary to re-contact the treating source for information on the claimant's compliance with treatment, or where blood drug levels are not satisfactory in the treating physician's record, they must be obtained through a purchased examination.  SSR 87-6, 1987 WL 109184, at *2 (S.S.A. 1987).  Accordingly, Defendant's motion on this issue should be DENIED, and remand is necessary for further development of the record in accordance with S.S.R. 87-6, to determine whether Plaintiff's condition results from uncontrolled physical causes or Plaintiff's non-compliance with his medication prescriptions.

Upon remand, the ALJ should contact Plaintiff's treating sources to obtain additional information about the frequency of Plaintiff's seizures and prescribed antiepileptic medications, [16] and Plaintiff's compliance with treatment during the period between May 30, 2008 and August 10, 2010.  If upon further examination of the facts, the ALJ finds the record of Plaintiff's anticonvulsant therapy to be unsatisfactory, the ALJ should purchase such examination in accordance with S.S.R 87-6, reevaluate Plaintiff's case in light of these records, and determine whether Plaintiff's epilepsy, alone or in combination with Plaintiff's other severe impairments, meets or medical equals the criteria under § 11.02, or any relevant listing such that Plaintiff is disabled. *Rosa v.* Callahan, 168 F.3d 72, 79 (2d Cir. 1999) (ALJ has affirmative duty to develop claimant's medical history where there are deficiencies in the record).  *See also*

---

[15] Social Security Rulings are agency rulings "published under the authority of the Commissioner of Social Security and are binding on all components of the Administration. These rulings represent precedent final opinions and orders and statements of policy and interpretations that [the SSA] ha[s] adopted." 20 C.F.R. § 404.35(b)(1).

[16] The undersigned notes the ALJ's determination did not include the list of medications provided by Plaintiff's counsel in a facsimile dated August 6, 2010.

*Cardoza v. Astrue*, 2012 WL 3727160, at *12 (D. Conn. April 13, 2012)(remand for further development of the record where ALJ erred in not obtaining additional information about frequency of claimant's seizures and compliance with antiepileptic treatment).

**Drug and Alcohol Abuse Materiality**

The burden of proving drug addiction or alcoholism ("DAA") immateriality to the ALJ's determination of disability is upon Plaintiff, *Cage v. Commissioner of Social Security*, 692 F.3d 118, 127 (2d Cir. 2012), and medical evidence that the Plaintiff would not be disabled absent the DAA will suffice. *Id.* In this case, the ALJ's determination that Plaintiff's alcohol abuse continued from April 23, 2008 until the date of the administrative hearing on August 6, 2010, is without support of the record. Further, the ALJ's reliance on Exhibits B3F, pp. 24, 57, 68, and B10F p. 19 (R. 18) in support of such determination, was error because such exhibits are irrelevant to Plaintiff's alcohol use. In particular, Exh. B3F page 24 (R. 243), pertains to Plaintiff's discharge from the VA Hospital on October 16, 2004, nearly 4 years prior to Plaintiff's alleged onset date of April 23, 2008. Exh. B3F page 57 (R. 277), records Plaintiff's bilateral reflex measurements on November 28, 2008 (R. 276), CSW Ingram's treatment notes indicating that Plaintiff reported drinking one to two beers a few times each week, and CSW Ingram's assessment that Plaintiff's alcohol abuse was in remission. (R. 277). The ALJ's reliance on Exh. B3F page 68, which is CSW Ingram's behavioral assessment of Plaintiff on June 6, 2008, is also misplaced as it supports that Plaintiff was no longer drinking alcohol

> [v]et came to the appointment stating he has been depressed and has some anxiety. Vet states he has a seizure disorder in which he was recently discharged

> from a local hospital. Vet reports he was drinking alcohol, hard liquor in
> particular. Vet reported he had been drinking, though after some confusion he
> states he has been drinking non-alcoholic beer since his release.

(R. 287).

At worst, the report is ambiguous with regard to whether Plaintiff continued to use

alcoholic beverages.

The ALJ's reliance on Exhibit B10F page 19, to support Plaintiff continued to

drink is also error as such evidence merely records CSW Ingram's treatment sessions

with Plaintiff on July 10, 2008, and July 28, 2008, that reference previous diagnoses of

Plaintiff's alcohol abuse and major depressive disorder, without any additional evidence

to support that Plaintiff continued to drink as of those dates.  (R. 346).  Exh. B10F page

46, Dr. Stanislawski's psychological assessment of Plaintiff on April 19, 2010, that

indicates Plaintiff "endorsed drinking 2 to 6 servings of beers a day, and reported no

symptoms of withdrawal after skipping a day or two" (R. 373), is the only evidence that

appears to support Plaintiff used alcohol while taking antiepileptic medication.  This,

without more, however, is insufficient to constitute substantial evidence to establish that

Plaintiff used alcohol throughout the entirety of a required 12-month durational period

from April 23, 2008 to April 19, 2010, the date at which CSW Macaluso noted Plaintiff

was drinking daily, such that Plaintiff is not disabled under § 11.02.  As such, the ALJ's

determination Plaintiff does not meet the criteria for disability under § 11.02 as a result

of Plaintiff's alcohol use is without substantial evidence, and Defendant's motion on this

issue should be DENIED.

**Affective Disorders**

In this case, the ALJ determined Plaintiff's anxiety disorder was severe, but that Plaintiff was not able to meet the criteria for disability under 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 § 12.04B ("§ 12.04B"), or 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 § 12.04C ("§ 12.04C") (R. 16).  Plaintiff does not contest such determination, and the undersigned finds substantial evidence supports the ALJ's determination.

To be disabled under § 12.04, a claimant must meet two of four criteria under Paragraph B of the Listing, specifically, that a disability claimant's affective disorder results in marked restriction of daily activities (§ 12.04B1), marked difficulties in maintaining social functioning (§ 12.04B2), maintaining concentration, persistence or pace (§ 12.04B3), or repeated episodes of decompensation each of extended duration (§ 12.04B4).  In this case, Plaintiff testified that he does not perform household tasks, but prepares meals, bathes and dresses without assistance (R. 44-45) (§ 12.04B1), and socializes with friends (R. 167) (§ 12.04B2).  Nothing in the record supports that Plaintiff's affective disorder results in marked difficulties in maintaining concentration, persistence, or pace (§ 12.04B3), and Plaintiff's singular admission to the hospital for attempting to stab himself (R. 378), does not rise to the level of severity necessary to meet the criteria required under § 12.04B4.  As such, substantial evidence supports the ALJ's determination that Plaintiff's affective disorder does not meet the criteria necessary to establish disability under § 12.04, such that Plaintiff is not disabled by an affective disorder.

**Credibility of Plaintiff's Subjective Complaints**

In the instant case, the ALJ, as required, evaluated Plaintiff's impairment under 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526, and determined that although the record establishes Plaintiff has the severe impairments of alcohol related seizure disorder, Raynaud's disease, and alcohol abuse, Plaintiff's statements concerning the intensity, persistence and limiting effects of Plaintiff's symptoms were not credible to the extent inconsistent with Plaintiff's testimony.  (R. 17).  Plaintiff contests the ALJ's credibility determination, specifically that the ALJ improperly evaluated Plaintiff's subjective complaints, Plaintiff's GAF scores, and Plaintiff's symptoms of peripheral neuropathy.  Plaintiff's Memorandum at 18.

It is the function of the ALJ, not the court, to assess the credibility of witnesses. *Tankisi v. Commissioner of Social Security*, 521 Fed. Appx. 29, 35 (2d Cir. 2013).  Pain or other symptoms may be important factors contributing to a disability claimant's functional loss and may affect a claimant's ability to perform basic work activities if relevant medical signs or laboratory findings show the existence of a medically determinable impairment that could "reasonably" be expected to cause the associated pain or other symptoms.  20 C.F.R. § 404.1529(c)(3).  "A claimant's testimony is entitled to considerable weight when it is consistent with and supported by objective medical evidence demonstrating that the claimant has a medical impairment which one could reasonably anticipate would produce such symptoms," *Hall v. Astrue*, 677 F.Supp.2d 617, 630 (W.D.N.Y. 2009) (citing *Latham v. Commissioner of Social Security*, 2009 WL 1605414, at *15 (N.D.N.Y. June 5, 2009)).  Here, substantial evidence does not support that Plaintiff's subjective complaints of disability result from Plaintiff's affective disorder.

In particular, contrary to Plaintiff's GAF score of 45 on April 17, 2010 (R. 378), indicating

that Plaintiff had a serious impairment in social, occupational, or school functioning,

Plaintiff reported that he helps get his children ready for school (R. 163), prepares

meals (R. 164), goes out with his wife (R. 165), goes grocery shopping (R. 167), and

takes care of his personal hygiene.  (R. 45).  The ALJ's determination that Plaintiff's

subjective complaints related to Plaintiff's affective disorder are not credible is thus

supported by substantial evidence, and Plaintiff's motion on this issue should be

DENIED.

The ALJ's determination that Plaintiff was not credible as a result of Plaintiff's

subjective complaints related to Plaintiff's neuropathy is also supported by substantial

evidence, as Plaintiff's neurologic examinations were normal (R. 382), with symmetric

reflexes and full motor strength, no muscle atrophy (R. 299), and normal gait and station

(R. 298).  Plaintiff's motion on this issue should therefore be DENIED.

**F. <u>Suitable Alternative Employment in the National Economy</u>**

Once an ALJ finds a claimant's impairments prevent a return to previous work,

the burden shifts to the Commissioner to prove substantial gainful work exists that the

claimant is able to perform in light of the claimant's physical capabilities, age, education,

experience, and training.  *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980). It is

improper to determine a claimant's residual work capacity based solely upon an

evaluation of the severity of the claimant's individual complaints.  *DeLeon v. Secretary*

*of Health and Human Services*, 734 F.2d 930, 937 (2d Cir. 1984).  To make such a

determination, the Commissioner must first show that the applicant's impairment or

impairments are such that they nevertheless permit certain basic work activities

essential for other employment opportunities. *Decker v. Harris*, 647 F.2d 291, 294 (2d

Cir. 1981). Specifically, the Commissioner must demonstrate by substantial evidence

the applicant's "residual functional capacity" with regard to the applicant's strength and

"exertional capabilities." *Id.* An individual's exertional capability refers to the

performance of "sedentary," "light," "medium," "heavy," and "very heavy" work.[17]

*Decker*, 647 F.2d at 294. In addition, the Commissioner must establish that the

claimant's skills are transferrable to the new employment, if the claimant was employed

in a "semi-skilled" or "skilled" job.[18] *Id.* at 294. This element is particularly important in

determining the second prong of the test, whether suitable employment exists in the

national economy. *Id.* at 296. Where applicable, the Medical Vocational Guidelines of

Appendix 2 of Subpart P of the Regulations ("the Grids") may be used to meet the

Secretary's burden of proof concerning the availability of alternative employment and

supersede the requirement of vocational expert testimony regarding specific jobs a

---

[17] "Sedentary work" is defined as: "lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools....Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

[18] The regulations define three categories of work experience: "unskilled", "semi-skilled", and "skilled". *Decker, supra*, at 295.
    "Un-skilled" is defined as: "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength....primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in thirty days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled jobs."
20 C.F.R. § 404.1568(a).
    "Semi-skilled work" is defined as: "work which needs some skilled but does not require doing the more complex work duties. Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work. A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks."
20 C.F.R. § 404.1568(b).

claimant may be able to perform in the regional or national economy.  *Heckler  v. Campbell*, 461 U.S. 458, 462 (1983).

In this case, the ALJ determined that Plaintiff retained the residual functional capacity to perform Plaintiff's past relevant work as a hand packager or cashier/checker with the limitation of occasional lifting and carrying of 50 pounds, frequent lifting and carrying of 25 pounds, standing and walking 6 hours on an 8 hour day, sitting 2 hours in an 8 hour day, never climbing ropes, ladders or scaffolds, or working in areas with unprotected heights, or around heavy, moving or dangerous machinery with occasional bending, climbing, stooping, squatting, kneeling, and crawling, no exposure to cold, and moderate stress.  (R. 16).  The ALJ afforded significant weight to Dr. Kelley's consultative opinion on December 21, 2009 that Plaintiff should refrain from working around heights, sharp (instruments), or heavy equipment, assigning less weight to Dr. Baskin's consultative opinion has a moderate limitation in ability to deal with stress, as Dr. Baskin's opinion improperly assessed Plaintiff with no history of alcohol abuse.  (R. 19).  Plaintiff contends that the ALJ's residual functional capacity assessment of Plaintiff is without substantial evidence as such assessment does not include Dr. Kelley's opinion that Plaintiff would require comfort breaks throughout each workday, Plaintiff's Memorandum at 10-12, and does not include Plaintiff's treating physician opinions supportive of Plaintiff's reduced residual functional capacity.  Plaintiff's Memorandum at 13.  Plaintiff's argument is contrary to evidence in the record.

Plaintiff correctly asserts that the residual functional capacity assessment completed by SDM Cumbo should not be included evidence as directed by Chief

Administrative Law Judge Frank Cristaudo in POMS[19] Instruction DI 24510.050C, (RFC assessments by single decision makers should not be afforded any evidentiary weight at the administrative hearing level). *See Curtis v. Astrue*, 2012 WL 6098258, at *6 (W.D.N.Y. Oct. 30, 2012).   In this case, however, the ALJ's RFC assessment did not rely on the SDM's determination, and Plaintiff's motion on this issue should be DENIED. Plaintiff's further contention the ALJ did not consider Dr. Kelly's opinion that Plaintiff would require comfort breaks is also without substantial evidence, as the Second Circuit does not require ALJs to separately discuss a claimant's ability to perform each exertional function, nor request a treating physician assessment, so long as the residual functional capacity determination is set forth with sufficient specificity and contains sufficient evidence from which the ALJ can assess the plaintiff's residual functional capacity.   *Swanson v. Colvin*, 2013 WL 5676028, at *6 (W.D.N.Y. Oct. 17, 2013) (citing *Tankisi*, 521 Fed. Appx. 29 at 35).   In this case, the ALJ included the consultative opinion of Dr. Kelley that Plaintiff should refrain from working around heights, sharps, or heavy equipment, and would require comfort breaks for repetitive bending or twisting of the lumbar spine, foot pedal work with both feet, and long periods of standing or walking (R. 300), and Dr. Baskin's opinion that Plaintiff would have minimal to no limitation in ability to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks with supervision, perform complex tasks independently, make appropriate decisions, relate adequately with others, and have moderate limitations dealing with stress (R. 295-96), in the ALJ's RFC assessment of Plaintiff.   The ALJ's residual

---

[19] The "POMS" is the Social Security Administration's Program Operations Manual System, an internal manual used by Social Security employees to process claims.

functional capacity assessment of Plaintiff is therefore based on substantial evidence, with appropriate consideration of Plaintiff's maximum ability to do sustained work in an ordinary setting on a regular and continuing basis. *Melville*, 198 F.3d at 52 (residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and must include a discussion of the individual's ability on that basis), and Plaintiff's motion on this issue should be DENIED.

Plaintiff's further contention that no evidence supports that Plaintiff's past earnings as a hand packager, unskilled medium work, and cashier/checker, establishes that Plaintiff's employment in such jobs constitutes substantial gainful employment is also contrary to substantial evidence. Plaintiff's Memorandum at 16.

In general, work experience means

> Skills and abilities you have acquired through work you have done which show the type of work you may be expected to do. Work you have already been able to do shows the kind of work that you may be expected to do. We consider your work experience applies when it was done within the last 15 years, lasted long enough for you to learn to do it, and was substantial gainful activity.

20 C.F.R. § 404.1565.

In this case, Plaintiff's previous work includes work as a cook (1995 - 1999; 2005 - 2006), painter (1998 – 1999), security guard (2007 – 2008), and therapy aid (September 2007 until November 2007). (R. 152). Plaintiff testified that Plaintiff's previous work also includes work as a cashier/checker at Office Max and Aldi's (R. 42), and work as a hand packager for SPS Temporaries. (R. 54). During the administrative hearing on August 6, 2010, the ALJ put forth Plaintiff's past work as a hand packager to the VE, which the VE determined was past relevant work based on Plaintiff's earnings records.

(R. 54).  The ALJ then put forth Plaintiff's three-month period as a manager at Office

Max to the VE, which the VE determined was too brief a time for Plaintiff to learn the

essential job functions to qualify as past relevant work.  (R. 55).  The ALJ next put forth

Plaintiff's past work as cashier at Aldi's, which the VE determined amounted to past

relevant work.  (R. 55).  As such, the ALJ properly relied on testimony of the VE in

determining Plaintiff's past relevant work, and Plaintiff's motion on this issue should be

DENIED.

     Upon further examination of Plaintiff's past relevant work as a hand packager

and cashier, the ALJ put forth the job of packager to the VE, and the VE classified the

job of packager/hand as medium, skilled and unskilled work.  (R. 54-55).  The ALJ then

considered Plaintiff's work as a cashier at Aldi's, which the VE classified as

cashier/checker, light exertion, semi-skilled, (R. 55-56) and determined that Plaintiff's

residual functional capacity limited Plaintiff to lifting or carrying 10 pounds, sitting 6

hours in an 8-hour day, standing or walking 2 hours in an 8-hour day, no working in

unprotected heights, or around moving or dangerous machinery, no climbing, stooping,

squatting, kneeling, or crawling, and no exposure to cold and only moderate stress,

after which the ALJ put forth such limitations to the VE who determined Plaintiff would

be capable of performing Plaintiff's past relevant work as a cashier/checker and hand

packager.  (R. 58-59).  As such, the ALJ's determination that Plaintiff retained the

residual functional capacity to perform past relevant work as a "light duty"

cashier/checker is based on substantial evidence and Plaintiff's motion on this ground

should be DENIED.  *Giunta v. Commissioner of Social Security,* 440 Fed. Appx. 53, 54

(2d Cir. 2011) (no remand where ALJ's residual functional capacity assessment comports with Plaintiff's ability to perform past relevant work).

## **CONCLUSION**

Based on the foregoing, Defendant's motions should be DENIED in part, Plaintiff's motions should be GRANTED in part and DENIED in part, and the matter REMANDED for further proceedings consistent with this Report and Recommendation.


Respectfully submitted,

/s/ *Leslie G. Foschio*


LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE



DATED:      March 7, 2014
            Buffalo, New York

Pursuant to 28 U.S.C. §636(b)(1), it is hereby

      **ORDERED** that the Report and Recommendation be filed with the Clerk of the Court.

      **ANY OBJECTIONS** to the Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of service of the Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

      **<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.</u>**

*Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited*, 838 F.2d 55 (2d Cir. 1988).

      Let the Clerk send a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

SO ORDERED.

                         /s/ *Leslie G. Foschio*

                     _____
                        LESLIE G. FOSCHIO
                UNITED STATES MAGISTRATE JUDGE

DATED:      March 7, 2014
             Buffalo, New York